OTTS v. I. M. LUDINGTON'S SONS, Inc., et al.

NICHOLSON v. SAME.

(District Court, W. D. New York. October 15, 1914.)

1. CANALS ⊂⊃18—OBSTRUCTION BY CONTRACTOR—INJURIES TO VESSELS.

A contractor for the widening and deepening of a state canal is bound in the exercise of reasonable care to ascertain from time to time as the work proceeds the depth of water in the canal and the condition of its prism in the locality, in order to avoid interference with navigation, and is liable for injuries to vessels caused by obstructions due to the work, whether by itself or by a subcontractor.

[Ed. Note.—For other cases, see Canals, Cent. Dig. §§ 20–24; Dec. Dig. ⊂⊃18.]

2. CANALS ⊂⊃18—OBSTRUCTION BY DREDGING CONTRACTOR—LIABILITY FOR INJURY TO VESSEL.

Injury to a canal boat forming part of a tow in the Erie Canal by striking a boulder left projecting from the bottom by respondents, who as contractors were engaged in dredging, held due in part to the negligent navigation of the tow, in failing to see or heed a buoy placed by respondents to mark the obstruction, and in part to the failure of respondents to sufficiently mark the place; there being four of the boulders at considerable distances apart.

[Ed. Note.—For other cases, see Canals, Cent. Dig. §§ 20–24; Dec. Dig. ⊂⊃18.]

3. ADMIRALTY ⊂⊃50—BRINGING IN NEW PARTIES.

Where the owner of canal boats comprising a tow in the Erie Canal brought suit to recover for an injury to one of such boats by striking an obstruction left in the bottom of the canal by respondents, who were contractors, and also as bailee of cargo lost, it is within the discretion of the court to permit respondents to file a cross-libel under admiralty rule 59 (29 Sup. Ct. xxxix) bringing in libelant's vessels, even after trial of the case has commenced.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 414–429; Dec. Dig. ⊂⊃50.]

4. CANALS ⊂⊃18—OBSTRUCTIONS LEFT BY CONTRACTOR—INJURY TO VESSELS.

A contractor and subcontractor, engaged in deepening the Erie Canal, held liable in part for injury to a passing canal boat by striking a rock left by them on the bottom of the canal; and the boat also held in fault for failure to exercise proper care, in view of a previous stranding, which caused her to leak and increased her draft.

[Ed. Note.—For other cases, see Canals, Cent. Dig. §§ 20–24; Dec. Dig. ⊂⊃18.]

In Admiralty. Separate suits by Joseph W. Otts, individually and as trustee and bailee of the cargo late laden on the canal boat Cumberland, and also by Charles Nicholson, individually and as trustee and bailee of the cargo late laden on the canal boat C. E. Collard, against

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

I. M. Ludington's Sons, Incorporated, and George W. Beeman. Decrees dividing damages.

Decrees affirmed 229 Fed. 538, —— C. C. A. ——.

Brown, Ely & Richards, of Buffalo, N. Y., for libelants.

Lewis, McKay & McMillan, of Rochester, N. Y., for respondents.

HAZEL, District Judge. Two canal boats, the C. E. Collard and the Cumberland, sustained damages by stranding on a submerged obstruction at the bend of the Erie Canal between bridges 115 and 116 in August and October, respectively, of the year 1911. In the libel filed in each case it is substantially alleged that the obstruction resulted from the use of a dipper dredge in the excavation of the barge canal, by which stones or boulders and other material were loosened or raised and left unguarded, so that they became a menace to navigation. Both cases were tried as one, the parties stipulating that the testimony in the Cumberland Case be considered in the Collard Case in so far as it applied.

Under contract No. 62 with the state of New York the respondent I. M. Ludington's Sons, Incorporated, was engaged to widen and deepen a section of the canal, and it entered into a subcontract for a portion of the work with the respondent Beeman, the operator of the dipper dredge which rolled the stones or other obstruction in question over into the bed of the old canal, which was higher than the newly excavated portion, decreasing the navigable depth of the water, so that it became and was insufficient for canal boats drawing 6 feet or more of water. Under sections 17 and 23 of said contract I. M. Ludington's Sons, Incorporated, was no doubt liable for damages caused by obstructions such as rock, débris, etc., in the canal unless such obstructions were guarded by watchmen, or marked by placards, or warning of their presence given in some other way.

[1] In the performance of work of this character a contractor is bound in the exercise of reasonable care to ascertain from time to time, by dragging or by some other suitable means, the depth of water in the canal and the condition of its prism in the locality where he is engaged, in order to avoid interference with navigation. The authorities bearing on this subject are many, and it will no doubt suffice to cite Adsit v. Brady, 4 Hill (N. Y.) 630, 40 Am. Dec. 305; Robinson v. Chamberlain, 34 N. Y. 389, 90 Am. Dec. 713; French v. Donaldson, 57 N. Y. 496; St. Peter v. Denison, 58 N. Y. 416, 17 Am. Rep. 258; and in this district, Huntley v. Empire Engineering Co. (D. C.) 189 Fed. 516, affirmed 211 Fed. 959, 128 C. C. A. 457. The initial question therefore in each case is whether the injury to the canal boat was due to the fault or negligence of the contractor, the subcontractor, or both. The duty of keeping the canal free from obstructions, or of adequately warning navigators of the danger therefrom, rested upon the principal contractor, as well as upon the subcontractor, by whose negligence the obstacle to navigation was actually created. By section 23 of the contract in question it is provided that the contractor shall be liable for damages resulting to the work, or from the work, during its progress, and as the dredging which raised the stone or obstruction in ques-

tion had direct relation to the work, and was not merely a collateral undertaking, the principal contractor cannot avoid responsibility therefor. Water Co. v. Ware, 16 Wall. 566, 21 L. Ed. 485; McCafferty v. S. D. & P. R. R. Co., 61 N. Y. 178, 19 Am. Rep. 267.

At the time of the accident to the Cumberland, she was made fast, pushboat fashion, ahead of the steam canal boat Columbia, which had three consorts in tow, including the pushboat, arranged in pairs and proceeding at the rate of 2½ miles an hour. An exhibit photograph of the bed of the canal, taken after the water was let out, showing a point about 1,000 feet easterly from bridge 116, discloses four stones or boulders of different sizes, from 33 to 56 feet apart, laying in a line lengthwise of the middle of the canal. Such stones, projecting into the water from 1 to 1½ feet above the adjacent ground and menacing navigation, concededly were not in the prism of the old canal in the spring of 1911. It is not definitely proven which of these stones or boulders the Cumberland struck; but, as several of them were rust-marked and indented, it is believed that such markings were caused by the stem irons of passing canal boats, and that the stem iron of the Cumberland contributed thereto. There was, however, other reliable evidence to justify the inference that she struck something, doubtless one of such stones, at about the point where the canal boat Collard had previously struck, and that she later drifted to the bridge at Holley, about one-half a mile away, where she sank.

The principal defenses are that, even though it be assumed that the mishap occurred through impact with a stone obstruction at the point specified, there is nevertheless no fault attributable to respondents, for the reason that with the water at normal depth there was ample space above the stone or other obstruction to permit the Cumberland to navigate in safety, and that a buoy sufficiently marked the immediate locality of the obstructions, so that, if the tow had been carefully navigated, the obstructions could, and no doubt would, have been avoided.

There was considerable conflicting testimony as to the depth of the water over the highest obstruction shown in the photographs in evidence, and the respondents assert that by their contract they were to provide a depth of water of simply 6 feet, and that, having done so, they cannot be held liable; and they claim further that they had received instructions from the superintendent of public works of the state, under whose supervision the barge canal is now in process of construction, that it would be sufficient to maintain 6 feet of water over stones, débris, or other obstructing material. In view, however, of my conclusions on the evidence relating to the maintenance of a buoy at the place of the accident to impart warning of obstructions, the question of the depth of the water over the obstructions, or the correct interpretation of the instructions given the contractor by the inspector, need not be passed upon. It is enough that the submerged obstruction upon which the Cumberland struck was in the prism of the canal and interfered with navigation of boats drawing 6 feet of water.

[2] I therefore pass to inquire whether the submerged stones or other obstruction with which the Cumberland came in contact were

distinctly and sufficiently marked. Testimony has been given tending to show that from August 11, 1911, the day the Collard grounded, throughout the months of September and October, and in fact to the close of navigation, the immediate vicinage of such stones or other obstruction was first marked by an iron rod, then by a scantling, and later by a beer keg painted white. If it is true that the obstruction upon which the Cumberland struck, or its reasonable vicinity, was distinctly and sufficiently marked at the time of the accident, respondents, in my opinion, performed their full duty to her, for the master of the tow was bound to take notice of all buoys or safeguards to navigation placed in or along the canal, especially where he perceived that work was going on. By the testimony of the witness McCarthy, an employé of the contractor, it appears that a lantern was placed each night on either side of the canal opposite a stake, scantling, or keg located in the canal at about where the Collard had struck, to indicate to boatmen the place of danger. There was much disputation as to the precise point where the buoy was placed and maintained. I am satisfied by the evidence that it was placed in the immediate vicinity of the stones shown in the exhibit photographs, 40 or 50 feet from the towpath side of the canal, but that it was not placed to specifically mark the said stones or boulders. The proofs are that the buoy was about 1,000 feet from bridge 116 over a high point in the canal bed, supposedly where the Collard had struck, or near thereto. There were many witnesses who testified that in passing on the towpath, or in performing their work on the canal, they often perceived the buoy or mark, others that they saw it daily, yet none was able to distinctly and definitely swear that it was in place at the precise time of the accident.

Importance is properly attached by respondents to the testimony of the witness Howe, who remembers that the keg was substituted for a stake because the stakes were usually knocked down by passing boats, and who from daily observation swears that such keg buoy was in place in the canal until the close of navigation. On cross-examination he declined to swear that the buoy was in place on the day of the accident, or on every day, yet his testimony impresses me favorably, and is not to be entirely ignored because he had no recollection of the precise position of the keg on the day of the accident, or on any other specified day. The witness Wise also testified that the buoy remained in place in the canal throughout the season, being replaced when knocked down by passing canal boats. The witness Fowler testified that he frequently saw the buoy, and that it remained in the canal until the water went out in the fall of the year; that at first there was a light on the stake, and that later lights were placed on the berm and towpath sides of the canal opposite thereto. He was unable to fix the day when the Cumberland sank, but was certain he saw the buoy from time to time up to such occurrence. The witness Campbell swore that it was his work to put out the lantern at night on the bank of the canal at, or near, the place of the accident, and to take it in in the morning, and that on such occasions he saw the buoy out in the canal.

The version of the witness Hiram Davis, a disinterested boatman, was that he also frequently saw the buoy while on his boat traveling from Hulberton to Rochester; that he saw the stakes that were driven into the bed of the canal, and later the white keg, together with the light on the berm side of the canal; and he testifies that there never was a time that the buoy was not there when he passed through. The witness Beeman substantially testified that after the keg replaced the stake it was anchored in the canal until the fall of the year. He conceded that occasionally passing boats would drag it out of place, but asserted that it was always put back, and that he saw it two or three times a day as he went back and forth to his work, and that on the day following the impact the keg was "in the canal, up where the Collard hit."

It is true that the witness Defendorf, for the libelant, testified that he was standing on the deck of the Cumberland at the time of the accident, alongside of the wheel, looking forward, and that he saw no keg in the canal in that vicinity, and that none was there at the time; still, as he was not on duty at that time, and the responsibility of lookout did not rest on him, I am disinclined to give absolute credence to his testimony on this point. Peter Quinn, the wheelsman at the time of the accident, was not produced, and no satisfactory explanation for not swearing him appears in the record. It should, however, here be stated that within the past few days, while this case was under consideration by the court, an application was made for leave to produce him and to take his testimony in rebuttal; but to grant such an application at this stage of the proceeding, on the excuse that he could not heretofore be found, in the face of the fact that he was in attendance on the court at the beginning of the trial, would not, in view of the circumstances, be a proper exercise of the discretionary power of the court. As Captain Otts, who was navigating the tow, was not on deck at the time of the accident, and as Quinn acted as steersman and lookout aboard the pushboat, his failure to give testimony cannot pass unnoticed. He was such an important witness that something should at least have been done to procure his testimony in rebuttal regarding the claim of respondents that a buoy marked the spot where the Cumberland struck. Under the circumstances the inference may, I think, fairly be drawn that his testimony would have shown that there was a buoy or mark, as claimed by the respondents, at or near the point where the accident occurred, which should have been sufficient notice to him to proceed at this point with carefulness and precaution away from the middle of the canal, over towards the towpath side, where the water was concededly of ample depth for safe passing. As the accident occurred at 1 o'clock in the afternoon, it should not have been difficult for him to have seen the white keg at a reasonably safe distance away, and failure to do so must be attributed to carelessness. If, on the other hand, he did see the buoy, the speed of the tow should have been reduced, and she should have proceeded at this point carefully and prudently. Having failed to do so, she must be held to have been negligently navigated, and therefore in partial fault for the injuries sustained by her.

Although in my judgment it was unnecessary for respondents to separately mark each obstruction in the canal, and while there are situations in which a single buoy might constitute sufficient warning to navigators to keep away from the middle of the canal, still I think the fact of there being a bend in the canal at the point in question, together with the fact that the canal boat Collard had previously struck in that vicinity, called for a better protection of navigation than was afforded by the maintenance at this point of a single buoy. The distance between the first and fourth stones was approximately 121 feet, with intervening spaces between the various stones of from 32 to 56 feet. If, after the accident to the Collard, the bed of the canal had been dragged with a rail, all the obstructions shown in the photographs would no doubt have been discovered and better protection given. Instead of this, the bottom of the canal was searched with a sounding rod, and a stake placed at what was supposed to be the highest point. The stones or boulders of the photographs were not found. The respondents were negligent in the performance of their contract with the state, because of their failure to sufficiently mark the place of danger. The burden of explanation was upon them, and their efforts to comply with the law by maintaining a single buoy at a point about 1,000 feet east of bridge 116 was insufficient notice or warning of the aforesaid obstructions. They were therefore also in fault for the mishap, and there must be a division of the damages.

[3] The libelant is the owner of the canal boats Columbia, Cumberland, Oswego, and Syracuse, comprising the tow at the time of the accident to the Cumberland. He has filed his libel as owner of such boats, and as bailee and trustee of the cargo aboard the injured boat. Neither the owners nor the insurers of the cargo have intervened herein. Under admiralty rule 59 (29 Sup. Ct. xxxix) a petition was filed by respondents while the trial was in progress for leave to file a cross-libel, in which it was prayed that in case the Cumberland and the respondents are both held in fault for the injuries sustained by the Cumberland, the other boats comprising the tow may be brought into the case and proceeded against, to the end that the entire loss may not fall on respondents. Libelant, however, objects to this petition on the ground that the rule did not contemplate the taking in of a party after the trial had commenced, maintaining that the issue to be presented by a cross-libel must be framed before the beginning of the trial. I am of the opinion, however, that the phrase "or within such further time as the court may allow," embodied in the rule, permits the bringing in of such other vessels or parties as in the judgment of the court ought to be proceeded against in the original action for a just and equitable settlement of the case. The cross-libel may be filed. Without the presentation of such issue the respondents would be obliged to pay the entire damage resulting to the boat and her cargo from the accident (The Atlas, 93 U. S. 302, 23 L. Ed. 863), unless they had recourse in personam against the libelants for contribution (Erie R. R. Co. v. Erie & Western Trans. Co., 204 U. S. 220, 27 Sup. Ct. 246, 51 L. Ed. 450), and such action should not be enforced in this case, for the reason that the Cumberland and companion boats,

were navigated as a single vessel, are owned by the same owner; and a proper adjustment of the damages without further litigation or expense can be had by bringing them into this proceeding.

[4] The mishap to the canal boat C. E. Collard may now be taken up. As heretofore intimated, she came in contact, in August, 1911, with an obstruction in the vicinity of the four stones shown in the exhibit photographs in evidence. Soon afterwards, under the direction of the subcontractor, the respondent Beeman, the obstruction was dynamited, and while there is no positive evidence to show that the Collard was injured by a stone or boulder, that she came in contact with a submerged refractory object in the bed of the old canal, which was raised or accumulated by respondents' dipper dredge, is fairly shown. Such obstruction was the approximate cause of her sinking, but I do not attribute to respondents the sole fault therefor.

It is shown that canal boats having a draft of 6 feet, drawn by horses or mules, require at least 6 feet and 1 inch of water in which to navigate with reasonable safety, and that at the time of the accident in question the water was at normal depth, or about 6 feet and 4 or 5 inches above the highest stone shown in the photographs. The witness Summer, the engineer in charge of the work for the state, testified substantially that there were 6 feet 7 inches of water in the canal over the highest obstruction, while the witness Wing, for libelant, assuming the correctness of respondents' testimony as to the water level, testified in effect that the highest obstruction was 6 feet 4.9 inches below the surface of the water at normal depth, and not 6 feet 7 inches, as testified to by the witness Summer. As the witness Wing is fairly corroborated by the respondents' witness Dernell, I incline to the belief that such lesser depth of water over the obstructions is fairly proven. Notwithstanding this discrepancy in the testimony as to the depth of the water over the obstructions, I think the Collard contacted the obstruction in question because she was at that point drawing considerably more than 6 feet of water as a result of her grounding at Hindsburg, five miles above Holley.

Libelant contends that this first grounding did not injure the Collard, and that she did not take on water as a result of it; but admittedly she was aground for upwards of half an hour, and her mules being unable to draw her off, it was necessary for a tugboat to release her. Her master and the witness Hudson, who was aboard the boat, deny that she leaked before she stranded at Holley; but I am in doubt as to such testimony, owing to the fact that three witnesses for respondents, who saw the Collard near bridge 116 at Holley before she fetched up on the obstruction, swore that just before grounding two of her crew were at her pumps, pumping fore and aft, which would seem to indicate that the Collard had received serious injury and that she was in fact taking on water. The probabilities arising from her difficulty in getting off the ground at Hindsburg and her advanced age—she was 17 years old—materially support the claim that she had sprung a leak, increasing her draft, and causing her to ground.

The dispute as to the depth of the water is complicated by the dynamiting done in that vicinity after the accident, but I am reluctant

to accept the view urged by libelants that the blasting was done to destroy evidence. It was, however, negligence on the part of the respondents to obstruct the highway of the canal upon which the libelant had the right to navigate, and such obstruction was, I think, the major, though not the sole, cause of the disaster. Although the Collard had the right to proceed to her destination without encountering obstructions placed in the bed of the canal by the contractor, yet it was her duty to exercise care and diligence in her navigation. Having taken on water in consequence of her grounding at Hindsburg, she should have delayed and reduced her draft, or in any event should have proceeded with care commensurate with the knowledge that an increase in her draft over the legal draft would subject her to risk and danger, especially where the barge canal work was in progress.

That respondents had no actual knowledge of the obstructions in question will not relieve them from responsibility therefor. It was their duty under their contract with the state to deepen and widen the canal, and in so doing to maintain it in navigable condition. They are therefore presumed to have known that to permit excavated stones, débris, or other material to remain in the canal would menace navigation, and even though they did not believe it dangerous they were nevertheless bound either to remove it or to see that it did not in any way interfere with the passage of canal boats or create a condition rendering it improper for them to use it as before.

The views expressed herein lead to the conclusion that as to the injuries sustained by both the Cumberland and the C. E. Collard the respondents I. M. Ludington's Sons, Incorporated, and George W. Beeman, jointly, are in fault with the libelants, and therefore the damages and costs must be equally divided between the wrongdoers; in the case of the Cumberland, the respondents jointly paying one half and the tow jointly paying the other half, and in the case of the Collard, the canal boat C. E. Collard and the respondents jointly must equally bear the loss.

Decrees may be entered accordingly.